IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SALAAM S.,

    Plaintiff,

v.

NANCY A. BERRYHILL,

    Defendant.

Case No. 17 C 5096

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Salaam S.[1] seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income. Salaam asks the Court to reverse and remand the ALJ's decision, and the Commissioner moves for its affirmance. For the reasons set forth below, the ALJ's decision is reversed and this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

### I. BACKGROUND

Salaam has a history of seizure episodes and depression. Salaam was 32 years old when he applied for benefits, asserting that he became unable to work on August 1, 2012 due to his impairments. (R. 207-13). Salaam obtained a GED in 1999 and previously worked as a warehouse worker, an unskilled medium exertion job. (R. 19, 69, 230).

Under the Administration's five-step analysis used to evaluate disability, the ALJ found that Salaam had not engaged in substantial gainful activity since his application date of August 27, 2013 (step one) and his seizure disorder was a severe impairment (step two). (R. 13). The ALJ also concluded that Salaam's depression was non-severe but caused mild limitations in activities

---

[1]     Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by his first name and the first initial of his last name.

of daily living and concentration, persistence, or pace. *Id*. at 14-15. The ALJ determined that Salaam's seizure disorder did not qualify as a listed impairment (step three). *Id*. at 15.

The ALJ then concluded that Salaam retained the residual functional capacity ("RFC") to perform light work (frequently lifting 10 pounds and occasionally lifting 20 pounds, among other things), *see* 20 C.F.R. § 416.967(b), except that he cannot work around hazards, such as unprotected heights or exposed moving mechanical parts and cannot operate a motor vehicle as part of his job. (R. at 15). Given this RFC, the ALJ determined that Salaam was unable to perform his past relevant work as a warehouse worker. *Id*. at 19. At step five, the ALJ found that Salaam could perform other jobs that exist in significant numbers in the national economy, such as hand packager, assembler, and sorter. *Id*. at 32. The Appeals Council denied Salaam's request for review on May 9, 2017, leaving the ALJ's April 28, 2016 decision as the final decision of the Commissioner. *Id*. at 1-7; *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).

## II. DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 416.920(a) (2012); *Clifford v. Apfel*, 227

F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 416.920(a) (2012). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (*quoting Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Although this is a generous standard, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id*. In its substantial evidence review, the Court considers the entire administrative record but does not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869. Finally, an ALJ's evaluation of a claimant's subjective symptoms will be upheld unless it is "patently wrong." *McHenry v. Berryhill*, 911 F.3d 866, 873 (7th Cir. 2018).

The ALJ denied Salaam's claim at step five of the sequential evaluation process, finding that he retains the residual functional capacity to perform a significant number of light, unskilled jobs in the national economy. Salaam challenges the ALJ's RFC determination on two main grounds. He first argues that the ALJ erred by failing to include a restriction related to stress in the RFC. Specifically, Salaam contends that the ALJ improperly disregarded Dr. Yu's opinion

3

that his seizures are most likely psychogenic and related to anxiety and stress.[2]  Second, Salaam objects to the ALJ's finding that he has the RFC to perform the lifting and carrying requirements of light work.  Salaam also questions the ALJ's subjective symptom evaluation.  As explained below, the Court concludes that the ALJ's RFC determination is not supported by substantial evidence and overturns the ALJ's decision on this basis.

A.  **RFC Determination**

The Court first addresses Salaam's contention that the ALJ's RFC assessment is unsupported by substantial evidence because the ALJ improperly disregarded Dr. Yu's opinion that Salaam's seizures are most likely psychogenic and related to anxiety and stress and thus failed to include a restriction related to stress in the RFC.  Under the regulation in effect at the time of Salaam's application, a treating physician's opinion regarding the nature and severity of an impairment is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2); *see* 20 C.F.R. § 416.927 (noting this rule governs claims, like Salaam's, filed before March 27, 2017).  "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  An ALJ must offer "good reasons" for discounting the opinion of a treating physician.  *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Thus, "[a]n inadequate evaluation of a treating physician's opinion requires remand." *Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017).

---

[2]  Psychogenic seizures "resemble epileptic seizures but are not attributable to epilepsy or abnormal electric activity in the brain.  No single cause of psychogenic seizures has been identified, but they are typically attributed to an underlying psychological disturbance." *Boiles v. Barnhart*, 395 F.3d 421, 422 (7th Cir. 2005).

4

On September 9, 2014, Salaam saw Jeffrey Yu, M.D., a neurologist, at Sinai Medical Group for an evaluation of his seizures. (R. 707-09). Salaam told Dr. Yu that he started having seizures twelve years prior when he was stressed and anxious about financial difficulties. *Id*. at 707. Salaam described two different kinds of seizure episodes. *Id*. The first type is characterized "by him banging his head against the wall or against the ground" or him becoming "violent and agitated" and "throwing around any nearby objects." *Id*. Salaam reported that these seizure episodes occur once every two to three weeks and usually when he forgets to take his seizure medications. *Id*. The second type involved Salaam falling to the ground, losing consciousness, shaking, biting his tongue, and sometimes with incontinence. *Id*. Salaam stated that these episodes occur about two times a week and often when he is stressed or anxious. *Id*.

During Dr. Yu's evaluation, Salaam acknowledged feeling depressed and anxious all the time. (R. at 707). He also admitted feeling tearful and going through mood swings. *Id*. Salaam reported that he saw a psychological counselor. *Id*. Dr. Yu's assessment was "possible episodes of seizures, sometimes characterized by loss of consciousness and convulsions" and at "other times he just seems to demonstrate agitated and violent behavior." *Id*. at 708. Dr. Yu noted: "I have some suspicion that some of these episodes may be more psychogenic and related to anxiety and depression and not actual seizure episodes." *Id*. at 708-09. He instructed Salaam to continue Tegretol 400 mg twice a day and start Lamictal given the frequency of the seizure episodes and because it may "help with mood stabilization." *Id*. at 709. Dr. Yu also referred Salaam for a psychiatric evaluation. *Id*.

Salaam returned to Dr. Yu three months later on December 16, 2014 for a follow-up on his seizure episodes. (R. 705-06). He reported that he continued to have the second kind of seizure episodes characterized by falling to the ground, losing consciousness and shaking, biting his

5

tongue, and sometimes with incontinence. *Id*. at 705. Salaam stated these seizures are usually associated with stress and anxiety and occur several times a week. *Id*. Dr. Yu noted, however, that Salaam was a poor historian and usually the seizure episodes were unwitnessed as he lived alone. *Id*. Salaam stated that he continued to be stressed out because he was homeless. *Id*. Salaam indicated that he would be seeing a psychiatrist for the first time that week. *Id*. Dr. Yu suspected that most of Salaam's seizure episodes were "psychogenic, given his bizarre description of his previous episodes in the past." *Id*. at 706. Dr. Yu instructed Salaam to continue Tegretol 300 mg three times a day and Lamictal 50 mg twice a day. *Id*. As to Salaam's anxiety, Dr. Yu noted that Salaam would "follow up with psychiatry this week." *Id*.

At Salaam's next visit with Dr. Yu on May 22, 2015, Salaam stated that he had a seizure episode in March 2015 and was seen at Sinai Hospital. (R. 703). Salaam told Dr. Yu that he then had two more seizures in April 2015 and was admitted to Jackson Park Hospital. *Id*. Salaam reported that he was "stressed out" when he had these seizures. *Id*. Dr. Yu wrote that Salaam's medications were then changed to Tegretol extended release 400 mg twice a day and Lamictal to 200 mg twice a day. *Id*. Dr. Yu also noted that Salaam "continues to take Ativan 2 mg as needed for anxiety, as well as citalopram 20 mg daily." *Id*. Dr. Yu stated that Salaam's seizures "seem improved at this time. Again, some suspicion that they are psychogenic but with the increased dosage of medications, it seems that he has been doing well." *Id*. at 704. Dr. Yu directed Salaam to continue Tegretol extended release 400 mg twice a day and Lamictal 200 mg twice a day and follow up with psychiatry for his anxiety. *Id*.

On January 11, 2016, Dr. Yu completed an Epilepsy or Seizure Disorder Report. (R. 905-10).[3] He stated that he had been treating Salaam since September 9, 2014 and last examined him

---

[3] It appears that Dr. Yu mistakenly indicated that he signed his report on January 11, 2015, not January 11, 2016. (R. 910). On the first page of the report, Dr. Yu wrote that the most recent date of

6

on January 8, 2016. *Id*. at 905. He listed Salaam's diagnoses as seizures and pseudoseizures. *Id*. Dr. Yu stated that the date of onset was sometime in 2002 but suspected pseudoseizures were first diagnosed on September 9, 2014. *Id*. In response to a question about the etiology of the seizures, Dr. Yu wrote: "[p]ossibly epilepsy, but most likely psychogenic, related to anxiety and stress." *Id*. As to clinical findings, Dr. Yu indicated that Salaam's neurological exam had been grossly unremarkable. *Id*. at 906.

Dr. Yu estimated that Salaam's grand mal seizures occurred once to twice a month during the day and Salaam loses consciousness, bites his tongue, and loses bladder or bowel control. (R. at 907-08). Dr. Yu added that Salaam has been injured during a seizure and is confused and agitated immediately following a seizure. *Id*. at 908. Regarding medication, Dr. Yu indicated that Salaam takes Tegretol and Lamictal for his seizures and his blood test levels are mostly therapeutic. *Id*. at 909. Dr. Yu reported no medication side effects. *Id*.

Dr. Yu characterized Salaam's prognosis as "fair." (R. at 910). As to factors which increase or lessen the onset of seizures, Dr. Yu opined that "anxiety and stress make his seizures worse." *Id*. Dr. Yu concluded: "High suspicion that some episodes, if not most, are psychogenically related and not from actual epilepsy given unusual behavior during some episodes such as stealing a TV. EEGs also have been unremarkable, despite frequency of seizures." *Id*.

The ALJ assigned little weight to Dr. Yu's assessment that Salaam's seizures occur once to twice a month. (R. 18). The ALJ reasoned that Dr. Yu never witnessed Salaam having a seizure, suggesting that Dr. Yu's opinion was "likely based on subjective complaints." *Id*. The ALJ did not assign any weight to the rest of Dr. Yu's opinion, including his opinion that Salaam's seizures

---

examination was January 8, 2016. *Id*. at 905. Therefore, the Court reasonably concludes that Dr. Yu completed the report on January 11, 2016 and that the January 11, 2015 date is a mistake.

7

are most likely psychogenic and related to anxiety and stress. The ALJ's discussion of Dr. Yu's opinion that Salaam's seizures are psychogenic and related to anxiety and stress is as follows:

> Additionally, the claimant's treating physician, Dr. Jeffrey Yu, completed a medical source statement wherein he reported that the claimant's seizures were psychogenic and related to stress and anxiety, rather than epilepsy. However, as noted above, the claimant denied experiencing any anxiety or emotional problems and failed to seek any formal mental health treatment.

(R. 18). The ALJ also stated: "Although his treating physician Dr. Yu, suspected that the claimant's seizure disorder was psychogenic and warranted psychiatric treatment, he nevertheless concluded that his disorder had improved with increased doses of his medications." (R. 17). This cursory treatment of Dr. Yu's opinion is inadequate for several reasons, as described below.

Although not directly raised by Salaam, the Court initially observes that the ALJ failed to articulate what weight, if any, he assigned Dr. Yu's opinion that Salaam's seizures were psychogenic and related to anxiety and stress, rather than epilepsy. It appears that the ALJ did not give controlling weight to this opinion of Dr. Yu, but the ALJ did not assign any specific weight to Dr. Yu's opinion. The weight given to the treating physician's opinion must be explained, not implied. The "ALJ's decision cannot leave the weight given to the treating physician's testimony to mere inference: the decision must be sufficiently specific to make clear to any subsequent reviewers the weight the ALJ gave to the treating source's medical opinion and the reasons for that weight." *Ridigner v. Astrue*, 589 F.Supp.2d 995, 1006 (N.D. Ill. 2008) (internal quotation and citation omitted); *see also* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (stating and ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").

Here, the ALJ provided no analysis concerning what weight he assigned Dr. Yu's opinion that some seizure episodes, if not most, are psychogenetic and related to anxiety and stress. The

8

Court cannot determine from the ALJ's opinion what specific weight the ALJ gave to Dr. Yu's opinion in this regard or why. *Thompkins v. Astrue*, 2010 WL 5071193, at *7 (N.D. Ill. Dec. 6, 2010) (noting that a "treating physician's opinion can be given controlling weight on some points and non-controlling weight on others."). Because the ALJ did not explain how he weighed Dr. Yu's opinion regarding the psychogenetic nature of Salaam's seizures, the Court cannot discern whether the ALJ considered Dr. Yu's assessment of how anxiety and stress contribute to the severity of Salaam's seizure disorder in evaluating Salaam's RFC. Accordingly, this case must be remanded so the ALJ can state the specific weight given to Dr. Yu's opinion and the reasons for it. *See* 20 C.F.R. § 416.927(c) (stating that the Commissioner "will evaluate every medical opinion we receive.").

Even if the Court could infer that the ALJ rejected Dr. Yu's opinion regarding the likely psychogenetic nature of some of Salaam's seizures, the purported reasons provided by the ALJ for disregarding Dr. Yu's opinion are legally insufficient and not supported by substantial evidence. The ALJ offered three rationales for apparently discounting Dr. Yu's opinion that Salaam's seizures were most likely psychogenetic and related to anxiety and stress. First, the ALJ discounted Dr. Yu's opinion that Salaam's seizures were psychogenic and related to anxiety and stress, rather than epilepsy, because Salaam "denied experiencing anxiety or emotional problems" on one occasion. (R. 18). This reason for ostensibly rejecting Dr. Yu's opinion was error.

Although an ALJ may discount a treating physician's opinion if it is contradicted by other substantial medical evidence in the record, the ALJ must minimally articulate his reasons for rejecting the treating physician's opinion. *Henke v. Astrue*, 498 Fed. Appx. 636, 639 (7th Cir. 2012). In rejecting Dr. Yu's opinion on this basis, the ALJ did not meet this standard. The ALJ rejected Dr. Yu's conclusion by pointing to Salaam's March 18, 2015 emergency room visit at

Mount Sinai Hospital, during which he reported suffering from depression but denied anxiety or emotional problems. (R. 18, 711, 716). Yet, the ALJ provided no explanation on how a single notation of a denial of anxiety specifically contradicted Dr. Yu's opinion that Salaam's seizure episodes are most likely psychogenic and related to anxiety and stress. "[B]y cherry-picking [the medical record] to locate a single treatment note that purportedly undermines [the treating physician's] overall assessment of [the claimant's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). As the Seventh Circuit has explained, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Id*. The ALJ needed to explain why an isolated instance of Salaam's denial of anxiety contradicted Dr. Yu's overall assessment of his condition. Absent such an explanation, it was not reasonable for the ALJ to rely on single instance where Salaam denied anxiety to discredit Dr. Yu's opinion.

The ALJ's second reason for not crediting Dr. Yu's opinion—that Salaam "failed to seek any formal mental health treatment"—is both legally and factually erroneous. (R. 18). While the regulations direct ALJs to consider treatment history when assessing the severity of a claimant's symptoms, 20 C.F.R. § 416.929(c)(3)(v), "an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); SSR 16-3p, 2016 WL 1119029, at *8 (March 16, 2016) (superseding SSR 96-7p for all decisions issued on or after March 28, 2016) (stating an ALJ "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not . . . seek treatment."). The ALJ "will consider and address reasons for not pursuing treatment that are pertinent to an individual's case." SSR 16-3p, 2016 WL 119029,

10

at *9.  Consequently, the ALJ "may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints." *Id.*, at *8.

In this case, the ALJ did not explore why Salaam did not seek formal mental health treatment.  Significant evidence in the record indicates that Salaam's lack of formal mental health treatment could have been a result of financial hardship. The Administration "has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013); SSR 16-3p, 2016 WL 1119029, at *9 (stating "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services.").  At the hearing, Salaam testified that he had been homeless and was currently sleeping in an old store. (R. 43, 53).  Salaam stated that the landlord "knew I was homeless, sleeping on the L so she let me sleep in the store." *Id*. at 43; *see also* (R. 705, 954).  An emergency room record dated January 21, 2016 notes that Salaam was homeless and staying in an abandoned store front. (R. 960).  Salaam also testified that he moved to Chicago from Tennessee in 2014 to obtain free healthcare. (R. 54).  In an Adult Function Report dated April 24, 2014, Salaam noted that he relies on food stamps. (R. 262, 264).  Despite this evidence, the ALJ did not ask Salaam about his perceived failure to seek formal mental health treatment at the hearing.  Because the ALJ is required to inquire about a claimant's reasons for not seeking treatment before drawing a negative inference, the ALJ erred in failing to consider whether the lack of formal mental health treatment was due to Salaam's inability to afford treatment. *See Colson v. Colvin*, 120 F.Supp.3d 778, 792 (N.D. Ill. 2015) (holding ALJ could not draw inference against claimant for failing to seek mental health treatment where ALJ did not explore why claimant, who was homeless and impoverished, had not sought mental health care).

The ALJ also failed to consider whether Salaam's anxiety contributed to his lack of formal mental health treatment. The Seventh Circuit has emphasized that "mental illness in general . . . may prevent the sufferer from . . . submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006); *see also Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) (finding "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."). The ALJ should have asked Salaam about his lack of formal mental health treatment before concluding that it undermined Dr. Yu's opinion that some of his seizures are most likely psychogenic and related to anxiety and stress. *See Rusch v. Colvin*, 2016 WL 693201, at *12 (N.D. Ill. Feb. 22, 2016) (holding ALJ should have considered whether claimant's anxiety itself was a barrier to treatment as her treating physician stated before discounting claimant for not seeking treatment from a mental health professional). On remand, the ALJ shall consider these possible explanations before drawing any adverse inferences. The ALJ shall also explain upon remand why Salaam's lack of formal mental health treatment "provides a reasonable basis to discount the [treating] physician's opinion." *Paul v. Berryhill*, 2019 WL 643261, at *4 (7th Cir. Feb. 15, 2019).

Further, the ALJ was factually inaccurate in his finding because he ignored Salaam's receipt of mental health counseling and treatment with prescription medication for anxiety and depression. While Salaam may have no formal mental health treatment, the ALJ did not acknowledge that Salaam received mental health counseling. Salaam testified that he sees a behavioral counselor, and he reported to Dr. Yu that he sees a psychological counselor. (R. 64, 707). The ALJ also did not address the fact that Salaam was prescribed Ativan for his anxiety and Citalopram for his depression. (R. 703, 915, 924, 925). Similarly, the ALJ ignored the fact that Dr. Yu added Lamictal to Salaam's medication regime in part because "it may also help with mood

stabilization." (R. 709). If the ALJ's rejection of Dr. Yu's opinion that Salaam's seizures are psychogenic and related to anxiety and stress "is based on the assumption that such evidence must be offered by a Board-certified psychiatrist, it is clearly erroneous." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). Accordingly, upon remand, the ALJ shall assess all relevant mental health treatment in evaluating Dr. Yu's opinion.

The ALJ further erred because he failed to weigh Dr. Yu's opinion using the factors that govern evaluation of a treating source's opinion. When an ALJ decides not to give controlling weight to a treating physician's opinion, he must still assign it a specific weight. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." SSR 96-2p, 1996 WL 374188, at *4 (rescinded for claims filed on or after March 27, 2017). The "regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). If the ALJ discounts the physician's opinion after considering these factors, the ALJ must minimally articulate his reasons. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *see also Schreiber v. Colvin*, 519 Fed.Appx. 951, 959 (7th Cir. 2013) (holding the ALJ must "sufficiently account" for the factors in 20 C.F.R. § 404.1527).

Here, the ALJ did not sufficiently account for the relevant regulatory factors. Other than acknowledging that Dr. Yu was Salaam's treating physician, the ALJ did not discuss the extent of the treatment relationship, the frequency of examinations, the supportability of the opinion, the consistency of the opinion with the record as a whole, or whether Dr. Yu had a relevant specialty. In fact, "there is no evidence that the ALJ applied—or was even aware of—the checklist. There

13

are no *explicit* references, or even indirect allusions to the factors." *Edmonson v. Colvin*, 2016 WL 946973, at *7 (N.D. Ill. March 15, 2016). Many of the relevant factors may favor crediting Dr. Yu's opinion. Dr. Yu specializes in neurology and treated Salaam for his seizure disorder from September 9, 2014 through January 8, 2016. (R. 56, 707, 905). Dr. Yu saw Salaam on four occasions (9/9/2014, 12/16/2014, 5/22/2015, 1/8/2016) for a year and four months. (R. 56, 703-09, 905). Dr. Yu has managed Salaam's medications, monitored the level of seizure medication in his blood, reviewed EEG results, and made medical findings with respect to Salaam's seizure disorder. As to consistency, there is no opinion in the record which contradicts Dr. Yu's conclusion that some of Salaam's seizures are most likely psychogenic and related to anxiety and stress. For these reasons, the Court finds that "proper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Yu's] opinion." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). On remand, the ALJ shall explain his analysis of the regulatory factors in weighing Dr. Yu's opinion.[4]

For his third reason for essentially rejecting Dr. Yu's opinion, the ALJ stated that "[a]lthough his treating physician Dr. Jeffrey Yu, suspected that the claimant's seizure disorder was psychogenic and warranted psychiatric treatment, he nevertheless concludes that his disorder had improved with increased doses of his medications." (R. 17). It appears that the ALJ impermissibly substituted his own lay assessment of the medical evidence for Dr. Yu's medical assessment. This is problematic because an ALJ may not conclude, without medical input, that a claimant's seizure disorder is not psychogenic. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (stating "[w]e have recognized that an ALJ cannot play the role of doctor and interpret

---

[4] Relatedly, the Court notes that the ALJ failed to address the factors listed in 20 C.F.R. 416.927(c) when determining what weight to give Dr. Yu's opinion that Salaam's seizures occurred once-to-twice a month. On remand, the ALJ shall re-evaluate and reweigh Dr. Yu's opinion regarding the frequency of Salaam's seizures in accordance with the regulatory factors.

medical evidence when he or she is not qualified to do so."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (noting "as this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Despite Salaam's improvement with increased doses of anti-seizure medication, Dr. Yu still opined that some, if not most, of his seizure episodes are psychogenic. Similarly, Dr. Yu found that anxiety and stress exacerbate Salaam's condition. In light of this, the ALJ played doctor when he seemingly concluded that Salaam's seizures are not psychogenic and related to stress and anxiety. Without the benefit of an expert opinion, the ALJ was not qualified to determine whether Salaam's improvement on increased doses of medications undermines Dr. Yu's opinion that some of Salaam's seizures are psychogenic. To the extent the ALJ inferred on his own that some of Salaam's seizures are not psychogenic because his condition improved on increased doses of medication, he erred.

The ALJ's errors with respect to Dr. Yu's January 11, 2016 opinion are not harmless. An ALJ's error may be considered harmless only if "we can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Where a claimant's limitations are stress-related, the RFC should account for the level of stress a claimant can handle. *Winsted, Jr. v. Berryhill*, 2019 WL 494052, at *4 (7th Cir. Feb. 8, 2019). The record, including Dr. Yu's opinion, supports a limitation on stress. For example, Salaam testified during the March 2016 hearing that stress is a trigger for his seizures. (R. 50, 534). Salaam indicated in his April 24, 2014 Adult Function Report that he does not handle stress well. (R. 267). Moreover, Dr. Yu opined that the cause of Salaam's seizures is most likely psychogenic, related to anxiety and stress. (R. 905). Indeed, the ALJ found that Salaam "has difficulty handling stress" at step two and noted that he "was advised to limit his stress." (R. 15, 17). Though this evidence

supports a limitation on stress, the ALJ essentially rejected Dr. Yu's opinion by failing to include a limitation in the RFC to account for stress. If the ALJ had properly considered Salaam's difficulty handling stress and Dr. Yu's opinion in assessing Salaam's RFC, then it is possible the ALJ would have included a limitation in the RFC to account for stress and the jobs that Salaam is able to perform would have changed. Because the Court is not confident that the ALJ will reach the same conclusion about Salaam's RFC if he adequately accounts for Salaam's stress limitation, the ALJ's errors are not harmless and require remand.

As part of his challenge to the ALJ's RFC assessment, Salaam next argues that the ALJ erred in concluding that he could perform the lifting requirements of light work. 20 C.F.R. § 416.967(b) ("[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds."). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). An ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.* laboratory findings) and nonmedical evidence (*e.g.* daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996); *see also Scott*, 647 F.3d at 740 (stating "[t]he ALJ needed to explain how she reached her conclusions about Scott's physical capabilities[.]").

Salaam's challenge to the ALJ's determination concerning his lifting ability is well-taken. The ALJ found that Salaam should not lift and carry items weighing more than 20 pounds "due to risk of injury upon dropping them in the event of a seizure." (R. 18). Salaam argues that the ALJ did not adequately explain why a risk of similar injury would not exist if he were lifting objects weighing 15 pounds, 10 pounds, or even 5 pounds. The Court agrees. It is unclear how the ALJ concluded that Salaam can lift up to 20 pounds, as opposed to 15, 10, or 5 pounds. Specifically,

the ALJ cites no medical evidence in the record to support the lifting component of the RFC determination. The Court recognizes that both state agency physicians found that Salaam did not have any lifting limitations. (R. 140, 153). The ALJ gave the opinions of the state agency physicians "partial weight" because they "similarly restricted [Salaam's] exposure to hazards." (R. 18). The ALJ did not state that he intended these opinions to provide support for the lifting restriction in the RFC. *See Scott*, 647 F.3d at 739 (stating the court confines its "review to the rationale offered by the ALJ."). No physician opined that Salaam could lift and carry items up to 20 pounds based on a risk of injury due to dropping items in the event of a seizure. Because the ALJ did not adequately justify the basis for the RFC's lifting limitation, he failed to build the requisite logical bridge between the evidence and his conclusion. *See Scott*, 647 F.3d 740 (holding that the ALJ's failure to identify any medical evidence to support her assessment of claimant's standing and lifting capabilities warranted reversal of the ALJ's decision).

**B.  Symptom Evaluation**

Because a remand is warranted on the above grounds, the Court need not reach Salaam's remaining arguments challenging the ALJ's subjective symptom evaluation. However, in order to provide guidance on remand, the Court makes the following observations.

First, in rejecting Salaam's claim that his seizures are disabling, the ALJ relied on Salaam's ability to travel to Tennessee. (R. 17). The ALJ failed to explain how Salaam's travel to Tennessee was inconsistent with either the alleged frequency of Salaam's seizures or the fact that stress exacerbates his seizure condition. *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (holding "the ALJ's assessment is problematic because the evidence does not support the inference the ALJ draws between Murphy's symptoms and her ability to take a vacation."). The ALJ also failed to acknowledge that Salaam testified that his seizures were worse when he was in Tennessee. (R. 67).

On remand, the ALJ shall explain how Salaam's ability to travel to Tennessee is inconsistent with his claims of disabling seizures to the point where his credibility would be diminished.

Second, the ALJ found that Salaam's work activity undermined his claim of disability. The ALJ stated: "[D]espite his alleged seizure activity, the claimant reported that he remained functionally capable of selling his essential oils for money and trading them for marijuana. I find the claimant's ability to engage in such work activity, despite his alleged recurrent symptoms, is inconsistent with his allegations of disability." (R. 18). At the hearing, Salaam testified that he earns "close to $200 a month" selling perfumes and body oils for cash. (R. 45-46). The ALJ did not inquire as to how often Salaam sold perfume and body oils, how many hours per week he worked, or whether he has a set or flexible schedule. An ALJ may consider part-time work efforts in assessing a claimant's credibility, but he must explain how "part-time employment supports a conclusion that [the claimant] was able to work a full-time job, week in and week out, given [his] limitations." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Here, the ALJ did not explain how Salaam's part-time work of selling perfumes and body oils is inconsistent with his claims of recurrent seizures. As the Seventh Circuit has noted, "[t]here is a significant difference between being able to work a few hours a week and having the capacity to work full time." *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010); *see also Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (noting that working an "occasional six-hour day is a far cry from full-time work day-in and day-out."). On remand, the ALJ should consider all the facts surrounding Salaam's part-time work selling perfume and body oils and explain how those limited efforts cast doubt on his allegation that his recurrent seizures prevent him from sustaining full-time work.

## III. CONCLUSION

For the foregoing reasons, the Commissioner's Motion for Summary Judgment [23] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

**SO ORDERED.**

Dated: March 8, 2019

Sunil R. Harjani
United States Magistrate Judge